JESSE HOYT *et al.*

*v.*

CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY.

93   601
129   285
93   601
153   86
93   601
50a   353

1. RAILROADS—*not compelled to deliver grain to a warehouse off its road.* A railroad corporation will only be compelled to deliver grain in the particular warehouse or elevator to which it is consigned when such warehouse or elevator is upon the line of its road. But the line of the road is not necessarily confined to tracks, side tracks, and switches by it owned or leased.

2. If a railroad corporation has already purchased, or secured by contract or otherwise, the legal right to use the track of another road necessary to reach a particular warehouse or elevator, then such warehouse or elevator may be considered as being upon its line. But when it has to run over the track of another company, for the use of which it has no license or contract, to reach such warehouse or elevator, it can not be compelled to run over such track in order to deliver grain.

3. SAME—*constitutional provision in relation to delivery of grain.* The mandate of the constitution in respect to the delivery of grain shipped in bulk, at the warehouse or elevator to which it is consigned, must be understood to be confined to a delivery by the common carrier at the warehouse or elevator where consigned when such delivery can be made by availing itself of tracks it has the legal right to employ or use.

4. SAME—*right to remove track connecting with that of another company leading to warehouse.* Where a railroad company built a side track from its road connecting with a side track of another company leading to a public warehouse, whereby it could reach such warehouse over a part of the track of such other company, and the circuit court enjoined it from removing such connecting track, it was *held,* that in view of the statutory provisions that every railroad corporation shall permit connections to be made, there was no error in enjoining the removal of the track at the suit of the owners of the warehouse.

APPEAL from the Appellate Court of the First District; the Hon. THEODORE D. MURPHY, presiding Justice, and Hon. GEO. W. PLEASANTS and Hon. JOSEPH M. BAILEY, Justices.

On the 27th day of November, 1876, appellants exhibited their bill in chancery in the circuit court of Cook county, praying for an injunction to restrain the Chicago, Burlington and Quincy Railroad Company from taking up a certain side track connecting the main track of said company's railroad

with a track running to a certain grain warehouse in Chicago, known as the "Union Elevator." The complainants are the owners of an undivided three-fourths of said warehouse, and Armour and Munger, two of the appellees, own the remaining one-fourth; but they, having interests in the subject matter of the suit adverse to the complainants, were joined with the Chicago, Burlington and Quincy Railroad Company as defendants to the bill.

An injunction *pendente lite* was granted as prayed for, and afterward, on the 5th day of April, 1877, the complainants filed a supplemental bill, charging that said company had refused to deliver at said warehouse certain car loads of grain received by it consigned thereto, and were refusing to receive, for transportation, grain consigned to said warehouse, and praying that said company be commanded to receive grain so consigned, and to deliver the same to said warehouse, and be restrained and enjoined from refusing so to do. Issues were duly formed upon both said original and supplemental bills, by answers and replications, and the cause being heard in the circuit court upon the pleadings and evidence, a decree was rendered in favor of the complainants, against said railroad company, in accordance with the prayer of both the original and supplemental bills.

From that decree an appeal was prosecuted to the Appellate Court for the First District. In the Appellate Court the decree, so for as it was based upon the original bill and merely enjoined the removal of the side track in controversy, was affirmed, but so far as it was predicated upon the supplemental bill was reversed, and the cause was remanded to the circuit court with instructions to modify the decree by striking out all the relief decreed under the supplemental bill and to dismiss the supplemental bill. From the judgment of the Appellate Court this appeal was taken to this court. Numerous errors and cross-errors are assigned.

It appears, from the evidence, that the warehouse in question was built in 1861, by Charles M. Smith and Albert Sturgis,

in pursuance of a certain agreement between them and the Chicago and Joliet Railroad Company, made on the 26th day of August, 1861. By this agreement, Smith and Sturgis undertook to construct, maintain and operate said warehouse, and receive and store therein all grain transported thereto by said company, observing, in so doing, the rules customary with other similar warehouses in Chicago, and exacting a compensation for storage no greater than that charged by other similar warehouses. Said Smith and Sturgis also agreed to furnish to said railroad company, free of cost, the necessary ground adjoining said warehouse, and between the same and said company's railroad, for laying down tracks, side tracks and turnouts. Said company, on its part, agreed to lay all necessary tracks, side tracks and turn-outs to said warehouse, for the use of said railroad and warehouse, in the best practicable manner, for the mutual benefit and convenience of the respective parties to said agreement, reserving the right to remove said tracks, in case any of the covenants or agreements on the part of said Smith and Sturgis should not be fully complied with. Said company further agreed to deliver or cause to be delivered to said warehouse, all grain transported over its railroad, from all points southward of Chicago, discriminating therein in favor of said Smith and Sturgis as against other warehousemen in Chicago, provided it could do so legally and without prejudice to its own interests. Upon the construction of said warehouse the Chicago and Joliet Railroad Company, or its lessee and successor, the Chicago and Alton Railroad Company, laid down two tracks running from the main track of what is now the Chicago and Alton Railroad, into said warehouse, and also constructed in front of and about said warehouse, side tracks, turn-outs, etc., sufficient for the convenient and economical delivery of grain by it to said warehouse. For several years after its erection this warehouse was the principal if not the only place in use for the storage of grain shipped to Chicago over the Chicago and Alton Railroad, but within the past few years several other similar warehouses

have been built on the line of said road, which now compete with it for this business. With the exception only of such grain as has been delivered to it by the Chicago, Burlington and Quincy Railroad Company, the sole business of this warehouse has been the storage of grain shipped over the Chicago and Alton railroad.

The evidence shows that there are in existence in Chicago, on the line of the Chicago, Burlington and Quincy railroad, three grain warehouses, known as the Burlington Elevators A, B and C, of sufficient capacity to store all grain shipped over that road, and furnished with all tracks, side tracks, turn-outs, etc., necessary for the convenient and economical delivery of grain thereto by that road. In the year 1866, in consequence of the destruction by fire of one of these warehouses, and of unusually large shipments of grain, the Chicago, Burlington and Quincy Railroad Company, to provide for the additional storage required by the emergency, laid a side track running from its own main track, and connecting, about fifteen feet from the entrance to the Union Elevator, with one of the tracks running into that elevator. So far as appears, no express permission was given by the Alton company to form this connection, nor does there seem to have been any objection thereto made by said company, or by the owners of the warehouse. By means of the connection thus established the Chicago, Burlington and Quincy Railroad Company was enabled to reach the Union Elevator, and during the year 1866 about one thousand car-loads of grain were delivered thereto by said company. In the year 1868 this side track was removed by said company, thus severing its connection with said warehouse.

Shortly afterward, Messrs. Munn and Scott, who, at the time, were managers and part owners of the Union Elevator, applied to said company to re-lay said track, so as to enable the Michigan Central Railroad Company to thereby reach said elevator, for the purpose of receiving grain therefrom for transportation to the East; and, on their application, the

track was re-laid, upon an express agreement or understanding, as is now alleged, that it should be used for no other purpose except for the removal of grain from said warehouse. It does not appear that the track since being re-laid has been used for any other purpose than for shipping out grain, excepting that in 1873 about two hundred car-loads of grain, mostly damaged, were delivered to this elevator by the Chicago, Burlington and Quincy Railroad Company. This delivery was made under very considerable disadvantages, owing to the fact that the doorways of the elevator were so low as not to admit of the entrance of the cars of that company, without the removal of the brakes.

It appears that defendants, Armour and Munger, who are joint owners with the complainants in the Union Elevator, are largely interested in the Burlington elevators, with which the complainants are seeking to bring the Union Elevator into competition. With a view to placing the Union Elevator in direct competition with the Burlington elevators, for the storage of the grain shipped over the Chicago, Burlington and Quincy railroad, the complainants, in the year 1874, caused the Union Elevator to be completely rebuilt, and the doorways enlarged so as to admit the Burlington cars, at an expense of something over $100,000. Armour and Munger being, as it seems, in ignorance of the purpose for which these repairs were being made, gave their consent thereto, and paid their proportion of the expense incurred. There is no pretence that, up to the time of filing of the original bill, any efforts or attempts had been made by the complainants to obtain shipments of grain to their warehouse over the Chicago, Burlington and Quincy railroad; but it is expressly averred that they had refrained from so doing in consequence of the hostility of that company, and a fear that should they attempt to obtain such shipments, the connection between said railroad and their warehouse would be instantly severed by the removal of said side track. Having obtained their injunction restraining the removal of the track, they seem to have com-

menced soliciting shipments of grain to their warehouse, and having obtained certain consignments which the company refused to deliver to them, the company at the same time, as is alleged, instructing its agents along its line to receive for shipment no grain consigned to said warehouse, the supplemental bill was filed.

It is insisted that the complainants are not entitled to a decree, because the Union Elevator is not upon the line of road of the Chicago, Burlington and Quincy Railroad Company, and can only be reached by the use of a track belonging to the Chicago and Alton Railroad Company, the use of which, for that purpose, has not been secured.

The president of the Chicago and Alton Railroad Company was examined as a witness, and, from his testimony, it appears that the tracks leading to, as well as those inside the elevator, were built by his company out of its own materials, and that ever since they were built, said company had had charge of said tracks, and kept the same in repair.

He says the Chicago and Alton Railroad Company had never, to his knowledge, given any license to the Chicago, Burlington and Quincy Railroad Company to run its cars over said track, nor had it, to his knowledge, interposed any specific objection to such use of said tracks, except that on one or more occasions it had claimed the first right to the use of the warehouse, though it never had claimed an exclusive right thereto. When his company had no occasion to use said tracks, he supposed the owners of the ground had a right to put them to other uses, but when it did use them, it had a right to them in preference to any one else.

Mr. MELVILLE W. FULLER, for the appellants:

1. The Appellate Court erred in finding that the Union Elevator is not on the line of appellee's railroad, and in the conclusion, as matter of law, that complainants were compelled to show affirmatively that the defendant company had acquired, by purchase or otherwise, an absolute right to use

the fifteen feet it was in the habit of using and the connection it had made by consent. Citing *Chicago and Alton Railroad Co.* v. *The People,* 67 Ill. 11; *Chicago, Burlington and Quincy Railroad Co.* v. *The People,* 77 id. 451; *Chicago and Northwestern Railroad Co.* v. *The People,* 56 id. 382; *The People, etc.* v. *Chicago and Alton Railroad Co.* 55 id. 95; *Vincent* v. *Chicago and Alton Railroad Co.* 49 id. 41.

2. It is *now* the law that the defendant must deliver to any elevator which "can be reached by *any* track owned, leased or used, or which can be used" by it. Const. art. xi, sec. 5, Rev. Stat. 1874, p. 80; Rev. Stat. 1874, p. 815, sec. 82.

3. Unless the people in the adoption of the constitution, and the General Assembly in the enactment of the statute, can not compel such delivery, the objection can not prevail. But the question is no longer open to debate. *Munn et al.* v. *The People,* 94 U. S. 113; Same v. Same, 69 Ill. 80; *Chicago and Alton Railroad Co.* v. *The People,* 67 id. 17; *Chicago, Burlington and Quincy Railroad Co.* v. *The People,* 77 id. 444; *Olcott* v. *Supervisors,* 16 Wall. 695; *The People, etc.* v. *Chicago, Burlington and Quincy Railroad Co.* 94 U. S. 155.

4. It can not properly be objected here that a *mandamus* or decretal order will not be issued to compel the performance of an act which the court has not complete authority to require to be done;—that can only be urged in cases where the want of power to comply appears affirmatively upon the face of the record, which is not this case. It is enough that complainants here show the defendant *can use* the track in question. The *possibility* of foreign intervention is not an excuse for non-compliance.

5. The existence of jurisdiction to award a mandatory injunction is beyond all doubt. *Robinson* v. *Lord Byron,* 1 Bro. C. C. 588; *Great N. of Eng. R. Co.* v. *C. R. Co.* 1 Coll. 507; *Henry* v. *Smith,* 1 K. & F. 392; *Attorney General* v. *Borough of Birmington,* 4 id. 547; *Rogers L. and M. Works* v. *Erie Railway Co.* 20 N. J. Eq. 390; Fry on Specific Perform-

ance, 433; 2 Redfield on Railways, 356; Story's Eq. Jur. sec. 861.

6.   Under our constitution and law, if the company took up this track, it would be compelled by *mandamus* or other appropriate action to replace it.   *Rex* v. *Severn and Wye Railway,* 2 B. & Ald. 646; *State* v. *H. and N. Railroad Co.* 29 Conn. 538.

Messrs. GOUDY, CHANDLER & SKINNER, for the appellee:

1.   The Union Elevator is not on the line of appellee's road, and can not be reached by any track owned, leased, or which can be legally used by said company.   Citing *Vincent* v. *Chicago and Alton Railroad Co.* 49 Ill. 45, *The People ex rel.* v. *Chicago and Northwestern Railway Co.* 55 id. 95; *Chicago and Northwestern Railway Co.* v. *The People,* 56 id. 367.

2.   The constitutional provision can not impair the obligation of a contract any more than if it was in a statute.   *Rouse* v. *Home of the Friendless,* 8 Wall. 430; *Rouse* v. *Washington Un.* id. 439.   The constitution does not determine what is a part of the line.   That is left to judicial determination.

3.   On the facts presented by the record, a court of equity will not compel the railroad company to receive and deliver grain.

4.   A mandatory decree ought not to be entered.   High on Injunc. sec. 2; *Lane* v. *Newdigate,* 10 Vesey, 192; *Irenberg* v. *East India Co.* 33 L. J. Ch. 392.

5.   The railroad company has the right to take up the track connecting with the Alton road.   Citing *Spruance case,* 57 Ill. 436; *Heyl* v. *P., W. and B. R. R. Co.* 51 Pa. St. 469; *State* v. *H. and M. R. R. Co.* 29 Conn 538.

Messrs. WILLIAMS & THOMPSON, also for the appellee:

The remedy provided in section 17 of the act of 1871, entitled "An act to establish a Board of Railroad and Warehouse Commissioners, and prescribe their powers and duties," is an exclusive remedy.

The side track which it is sought to compel the defendant company to use, crosses public streets in the city of Chicago. A license or permission from the city is necessary to be obtained before their use can be made lawful, and none such has been granted. Citing *Hempstead case*, 55 Ill. 95, *Ex parte Paine*, 1 Hill, 666, *Ex parte Clapper*, id. 548.

Mr. CHARLES B. LAWRENCE closed the case in an oral argument in behalf of appellants.

Mr. JUSTICE BAKER delivered the opinion of the Court:

In *Vincent* v. *Chicago and Alton Railroad Co.* 49 Ill. 33, it was held by this court a railway company could not be required by legislative enactment to transport freight beyond its own line of road, but that the 22d section of the Warehouse act of 1867 was valid as to the warehouses upon such line. It was also there held that when, for a valid consideration, the company had permitted a connection with its line to be made and a side track to be laid, for the use of a particular lot of ground, and in order to transport to such lot heavy articles of freight, then such side track was to be considered as a part of its line for the purposes of delivery.

The same doctrine was iterated in *The People ex rel. Hempstead* v. *Chicago and Alton Railroad Co.* 55 Ill. 95, and it was there said, to compel a railroad company to receive and deliver freights off and beyond their own line would be not only oppressive, and involve their business in inextricable confusion, but would impose burdens and responsibilities upon them which they never contracted to assume.

In *Chicago and Northwestern Railway Co.* v. *The People*, 56 Ill. 367, it was said the rule announced in the *Vincent case* did not compel the delivery of grain at an elevator merely because the delivery was physically possible. And it was there held the Wisconsin and Milwaukee divisions of the Northwestern company and the Galena division of said company, though belonging to the same corporation and having

a common name, and although connected by rail, were, under the peculiar circumstances of that case, for the purposes of transportation, substantially different roads.

We may take it then as the established doctrine, that a railroad corporation will only be compelled to deliver grain in the particular warehouse or elevator to which it is consigned when such warehouse or elevator is upon the line of its road. Of course, the line of the road would not necessarily be confined to tracks, side tracks and switches by it owned or leased. But the mere fact a company sometimes actually makes use of a track, does not of itself, and under all circumstances, constitute such track a part of the road of the corporation. In *The People* v. *Chicago and Alton Railroad Co. supra,* although the company had previously, in repeated instances, delivered freight at the elevator of relators by use of a switch track belonging to another company, yet it was expressly held it could not, in the absence of an existing contract to justify such use, be compelled to so deliver, and could not be coerced to purchase from the other company the right to make such delivery.

We regard that case as decisive of this. If a railroad corporation has already purchased or secured, by contract or otherwise, the legal right to use the track of another road necessary to reach a particular warehouse or elevator, then such warehouse or elevator, for the purposes of delivery, may be considered as being upon its line. But here, in order to arrive at the Union Elevator, there are fifteen feet of railroad track, belonging to the Chicago and Alton Railroad Company, that the defendant company would be compelled to run over, and which it has no legal right to use. Under the evidence in this record, there is no pretence for saying it has a license from the Alton company for so doing; and the testimony of the president of that company rebuts any such presumption. The most that can be said is, that company, thus far, has interposed no objection to such employment of the track when not itself using it. This acquiescence is merely voluntary,

and may at any moment cease. A court would hardly assume to compel the defendant corporation to do that which the corporation has no legal right to do. We said in the *Hempstead case:* "That a railroad company may, by special agreement, run their cars over the track of another, is not doubted, but that they can be compelled to do so, is not and can not be admitted." So, here, although this company has occasionally run its cars over this track of the Alton company by the mere acquiescence of that company, and because not prevented therefrom, yet that it can be compelled to do so does not follow.

The *Vincent case* was essentially different from this. There, the only party having a legal right to object to the desired employment of the tracks had himself provided them for the express purpose of such use, and was insisting upon the delivery; while here, the Alton company, which laid and keeps in repair, and has charge of the track, and a part of whose line of road it forms, is no party to this suit, and the scope and theory of the bill is, that said fifteen feet of railroad track is part and parcel of the line of the Chicago, Burling and Quincy company.

The fifth section of article 13 of the constitution of 1870 provides as follows: "All railroad companies receiving and transporting grain in bulk or otherwise, shall deliver the same to any consignee thereof, or any elevator or public warehouse to which it may be consigned, provided such consignee, or the elevator or public warehouse, can be reached by any track owned, leased or used, or which can be used by such railroad companies; and all railroad companies shall permit connections to be made with their track, so that any such consignee, and any public warehouse, coal bank or coal yard, may be reached by the cars on said railroad."

The effect of this constitutional provision may be to change the rule announced in *The People ex rel. Spruance* v. *Chicago and Northwestern Railway Co.* 57 Ill. 436, and other cases, that, by the common law, railroad companies could not be

constrained to permit individuals to connect side tracks of
their own with the tracks of the companies, in order to enable
the latter to carry grain to warehouses or elevators which
have been erected off their lines of road; as, also, the rule
where two roads or divisions are owned or leased by one cor-
poration and are connected by rail. But here, this fifteen
feet of railroad track—and, so far as legal principle is in-
volved, it may as well be that insignificant distance as a much
greater—is not owned, or leased, or used by any claim of
right by the defendant company. Nor is this a case where
the owner of an elevator has constructed a side track, and is
seeking permission to form a connection with the track of the
railroad; nor yet is it a case wherein the complainants are
proceeding not only against the defendant company, but also
against the Chicago and Alton company, as owner of the side
track that leads into the elevator, to compel a delivery by the
defendant company, at the junction of the tracks, to the Alton
company, and a delivery by the latter in the elevator.

We are unable to perceive wherein the section quoted from
the constitution changes the law so far as regards the case in
hand. As was well said by the Appellate Court, in giving
their reasons for the reversal of the decree herein, "we can
not suppose it to be the intention of the constitution to
impose upon railroad corporations the duty of performing
any act which they have no legal right to perform. To the
extent of their legal rights and powers, the mandate of the
constitution is doubtless operative. If the place of consign-
ment can be reached by any track of which the railroad com-
pany is the owner or lessee, or in the lawful use, or which can
be lawfully and rightfully used by it, the company is bound
to deliver at that place. This, however, we think is the
extent of the duty imposed by the constitution. The con-
trary interpretation would involve the fundamental law in the
absurdity of commanding the performance of an unlawful
act."

Where a railroad company has given no license or permission to another company to use their tracks, then such tracks never become a part of the line of road of the other company. We understand that, as matter of fact, the lines of all the numerous railroads leading into Chicago are connected; so that, physically, it is possible grain reaching that city, in bulk, on any one of these roads could be delivered by the carrier in any of the elevators or public warehouses connected by side track or switch with any of the other roads. To hold the law forces such delivery, regardless of a requirement of legal right vested in the carrier to so make use of these tracks of other companies, would lead to results most disastrous, and would be subversive of the vested rights of railroad corporations. The mandate of the constitution must necessarily be understood to be confined to a delivery by the common carrier at the warehouse or elevator where consigned, when such delivery can be made by availing itself of tracks it has the legal right to employ. In our view, this point is conclusive of the case, and it is needless to consider the other questions discussed by counsel for appellants and raised by his assignments of error.

Under the circumstances connected with the laying of the track that reaches from the Burlington main track to the Alton track running into the elevator, and in view of the statutory provision that every railroad corporation shall permit connections to be made and maintained with its track to and from any and all public warehouses where grain is or may be stored, and the further requirement that every such corporation shall receive and deliver all grain consigned to its care for transportation at the crossings and junctions of all other railroads, we are not prepared to say the portion of the decree rendered by the circuit court that was based on the original bill and affirmed by the Appellate Court was erroneous.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*