## National Elevator & Dock Co. et al. v. Chicago, M. & N. R. R. Co., and Ill. C. R. R. Co.

1. RAILROADS—*Common Carriers—Consignment of Grain—Meaning of the Word "Consigned."*—In a contract between the Chicago M. & N. Railroad Company and an elevator company of Chicago, concerning the delivery of grain to its elevators, it was provided that "all cars loaded with grain, consigned to either of said elevators, which shall be brought to Chicago over their respective lines of railroad," etc. *It was held* that the word "consigned" as used, was meant to include all grain directed either by the consignor or consignee, or by a purchaser, either at the time of shipment or afterward, within the customary period before delivery.

2. RAILROADS—*Common Carriers—Chicago Shipments—No Elevator Named—Custom.*—Where grain is consigned to a commission house in Chicago, generally, without naming any particular elevator to which it

shall be delivered, the custom is that the car containing it shall be switched to a side track and there remain for a period of forty-eight hours for inspection and marketing of the grain. After such an inspection, and within forty-eight hours of its arrival, the owner or the purchaser, if he shall sell it, has the right to direct the same to be delivered, if to an elevator, to such elevator as he shall by notice to the railroad company direct, and that it is the duty of the railroad company to deliver it, if to an elevator connected with the railroad upon which the same has been transported, at no greater charge per car where such grain has been sold after arrival and before delivery, than where the same has been directed to be delivered by the owner, either at the point of shipment or afterward, and before delivery.

3. RAILROAD—*Common Carriers—Statutory Duty to Deliver to an Elevator on its Line of Road.*—Under the law of the State it is the duty of a railroad company to deliver to any elevator on its line of road without unjust discrimination as to rates, all grain, whether consigned to that elevator at the point of shipment, or otherwise directed to be delivered to an elevator. by the owner or consignee, while the grain is in possession of the railroad company.

4. RAILROADS—*Common Carriers—Meaning of the Term " Elevator on its Line of Road."*—The Chicago M. & N. Railroad Company entered into a contract with the Chicago and Alton Railroad Company securing the right to use a side track of the latter company for the purpose of delivering grain brought by it to Chicago, and consigned to elevators situated upon this side track. *It was held,* that these elevators were to be considered as being on the line of the Chicago, Milwaukee & Northern Railroad Company, for the purpose of delivering grain as a common carrier under the statute.

5. CONTRACTS—*Rules of Construction.*—In the interpretation of contracts reference to the circumstances surrounding the parties must be had, and that construction which supports the contract and makes it effective for the purposes for which it was intended should be adopted.

6. WORDS—*Interpretation of Meaning, etc.*—In the interpretation of the meaning of a word in a penal statute strict rules apply. But when the word to be interpreted exists in a contract, the court will, so to speak, put itself into the shoes of the parties in order to find out what their use of the word, under all the circumstances, means.

7. MISJOINDER—*Parties in Chancery Proceedings.*—Where the presence of a party in a chancery proceeding is in no way necessary to the doing of full justice, a dismissal should be had as to such party, and where the point has been raised in the court below, what should have been done in that court may be directed to be done by the Appellate Court.

**Memorandum**—Suit in chancery. In the Circuit Court of Cook County; the Hon. OLIVER H. HORTON, Judge, presiding. Bill for the

specific performance of a contract; answer; decree of dismissal on final hearing for want of equity; appeal by complainants. Heard in this court at the March term, 1893, and reversed with directions. Opinion filed June 20, 1893.

The statement of facts is contained in the opinion of the court.

Appellant's Brief, George Smith and John M. Palmer, Attorneys.

What did the parties mean when they agreed that said railroads "would deliver or cause to be delivered" to these elevators, "all cars loaded with grain, consigned to either of said elevators, which shall be brought to Chicago," by said railroads?

Did they, as claimed by appellees, agree to deliver only such grain as should be "consigned" to these elevators at the point of shipment, or, as insisted by appellants, all grain brought to Chicago, whether consigned at point of shipment, or consigned at any time while in the possession of these roads? Jones on Const. of Commercial and Trade Contracts, Sec. 81; Browne on the Admissibility of Parol Evidence, Secs. 53–56; Robinson v. Stow, 39 Ill. 568; Bradley v. Washington, etc., Steam Packet Co., 13 Peters 89 (leading case); Nash v. Towne, 5 Wall. 689; Barreda v. Silsbee, 21 How. 146; Reed v. Ins. Co., 95 U. S. 23; United States v. Peck, 102 U. S. 64; Merriam v. United States, 107 U. S. 437.

In Stephen's Evidence, Art. 91 (4) the rule is stated as follows:

In order to ascertain the relation of the words of a document to facts, every fact may be proved to which it refers, or may probably have been intended to refer, or which identifies any person or thing mentioned in it.

Such facts are called the circumstances of the case.

An agreement always ought to receive that construction which will best effectuate the intention of the parties to be collected from the whole of the agreement, and greater regard is to be had to the clear intention of the parties than to any particular words in the expression of their intent.

Ford v. Beach, 11 Q. B. 866; Jones' Coml. & Trade Contracts, Sec. 218.

The construction which supports a contract is taken as the true one, for parties are always supposed to have intended something rather than nothing by what they have said. If, therefore, a particular construction in harmony with the words used would render an agreement frivolous and ineffectual, and so frustrate the object which the parties intend to accomplish by it, this construction will be set aside for one which will support the contract. Jones' Coml. & Trade Contracts, Sec. 223, and cases cited. Peckham v. Haddock, 36 Ill. 38.

Under the statute a railroad company is required to deliver to any elevator situated on its line of road, without unjust discrimination as to rates, all grain, whether consigned to that elevator at the point of shipment, or otherwise directed to be delivered to the elevator by the owner, consignee, etc., while the grain is in the possession of the company.

As to delivery, see R. S. Ill., Chap. 114, Secs. 121, 122, 2 Starr & Curtis, p. 1954–5; Vincent v. C. & A. R. R. Co., 49 Ill. 33; People v. C. & A. R. R. Co., 55 Ill. 95; Chicago & N. W. Ry. Co. v. People, 56 Ill. 365; Spruance v. C. & N. W. Ry. Co., 57 Ill. 436; Hoyt v. C. B. & Q. R. R. Co., 93 Ill. 601.

As to unjust discrimination, see R. S. Ill. 1891, Chap. 114, Secs. 118, 124, 125; Chicago, B. & Q. R. R. Co. v. Parks, 18 Ill. 460; Chicago & A. R. R. Co. v. People, 67 Ill. 11; Chicago, B. & Q. R. R. Co. v. People, 77 Ill. 443; Indianapolis, D. & P. R. R. Co. v. Ervin, 118 Ill. 304; Illinois C. R. R. v. People, 121 Ill. 304; St. Louis, A. & T. H. R. R. Co. v. Hill, 14 Brad. 579; Ill. etc., Co. v. Beaird, 24 Ill. App. 322.

Parol evidence is competent to annex to a contract a custom or usage of the business and locality, known to the parties, or so general and well settled as to be presumed to be known to them, and with reference to which they must be deemed to have contracted. Browne on Parol Ev., Sec. 58.

Jones' Coml. & Trade Contracts, Sec. 97, *et seq.;* Doane v. Dunham, 79 Ill. 131; Corbett v. Underwood, 83 Ill. 324; Bailey v. Bensley, 87 Ill. 556; Robinson v. U. S., 13 Wall. 363; Richmond v. Union Steamboat Co., 87 N. Y. 240.

Usage will govern manner of delivery. Hutchinson, Carriers, Secs. 338 and 342, and cases cited. Richmond v. Un. Steamb. Co., 87 N. Y. 240.

There is nothing in the agreement which requires the word "consign" to be so construed as to limit its application only to grain ordered to the elevators at the point of shipment. No reason is perceived why grain ordered to the elevators after it has reached Chicago, is not as much consigned to these elevators as grain which is consigned thereto at the point of shipment.

The following definition of the word is taken from the Century Dictionary:

To transmit by carrier in trust for sale or custody; usually implies agency in the consignee, but also used loosely of the act of transmitting by carrier to another for any purpose; as, the goods were consigned to London agent.

APPELLEES' BRIEF, C. V. GWIN, ATTORNEY.

The defendants are neither under a common law or statutory duty to deliver grain to said elevators, because the elevators are not located on the line of railroad of the defendants, and because the defendants have no legal right by contract, license or otherwise, to use or operate the tracks of the Chicago & Alton Railroad which alone connect with said elevators. Hoyt v. C., B. & Q. R. R. Co., 93 Ill. 601.

The defendants are not bound by the contract with the Elevator Company and Keith & Company to deliver to either of said elevators grain purchased, etc., because under said contract they were only bound to deliver to said elevators such grain as is consigned at the time of shipment to said elevators or either of them. Chicago & N. R. R. Co. v. Stanbro, 87 Ill. 195.

OPINION OF THE COURT, SHEPARD, J.

This is an appeal from a decree, entered on a final hearing, dismissing for want of equity a bill filed by appellants against appellees, for the specific performance of the contract next below set forth, and for an injunction against appellees from refusing to deliver grain ordered to either of the elevators named in the contract.

The agreement, omitting the attestation clause and signatures, is as follows:

" Agreement made this first day of October, A. D. 1891, between the Chicago, Madison and Northern Railroad Company, party of the first part, the Atchison, Topeka and Santa Fe Railroad Company in Chicago, party of the second part, the National Elevator and Dock Company, party of the third part, and the firm of Keith & Company party of the fourth part.

Whereas, the party of the third part is the owner of certain premises in the city of Chicago, known as lots one (1), two (2), three (3), four (4), five (5), six (6), seven (7), eight (8), and the east half of lot nine (9), in block two (2,) in South Addition to Chicago, on which premises a grain elevator or warehouse has been constructed, known as the National Elevator, in which the party of the third part is carrying on the business of public warehousemen of grain; and

Whereas, the party of the fourth part is the owner of certain premises in the city of Chicago, known as lots one (1), two (2), three (3), four (4) and five (5) of block one (1), in Canal Trustees' subdivision of south fraction section twenty-nine (29), in township thirty-nine (39) north, range fourteen (14), east of the 3d principal meridian, on which premises or part thereof, a grain elevator or warehouse has been constructed, known as the Chicago and St. Louis Elevator, in which the party of the fourth part is carrying on the business of public warehousemen of grain; and

Whereas, the parties of the third and fourth parts are apprehensive that the real estate owned by them respectively, as above recited and described, may be injuriously affected

or damaged by the construction of the railroad, or by the street improvements and other public works contemplated in a certain ordinance passed by the city council of the city of Chicago, on the 1st day of August, 1889, and approved by the mayor on the fifth day of the same month, a copy whereof is hereto appended and made part hereof; and

Whereas, the party of the second part is interested in the said ordinance and expects to use the railroad tracks therein authorized to be laid, or some of them, for the passage of its own engines, cars and trains to and from the city of Chicago;

Now, therefore, it is hereby covenanted and agreed by and between the said parties as follows :

First.  The parties of the third and fourth parts, in consideration of the covenants and agreements hereinafter contained on the part of the parties of the first and second parts to be kept and performed, do hereby severally consent to the construction of the said railroad as proposed in said ordinance; and the said party of the fourth part covenants and agrees to release the said parties of the first and second parts, and also the Chicago & Alton Railroad Company, from any and all claims for damages which may result to the property above described, owned by said party of the fourth part, from the construction of the said railroad and the railroad tracks provided for in said ordinance, or the use thereof, or from the making of the street improvements and other public works required or provided for in the said ordinance.

And the said party of the third part, in consideration aforesaid, covenants and agrees, that while and so long as the property above described, owned by it, shall continue to be used for grain elevator or warehouse purposes, it will not set up or make any claim against the parties of the first and second parts, or either of them, or the Chicago & Alton Railroad Company for damages which may have resulted or may result to the property above described so owned by it, by reason of the construction of the said railroad and the railroad tracks provided for in said ordinance, or the use

thereof, or from the making of the street improvements and other public works required or provided for in said ordinance; and that these presents may be pleaded in any court of law or equity as a bar, and in discharging of all and every action, suit, or other proceeding which shall or may be commenced, prosecuted or taken against the said parties of the first and second parts, or either of them, or against the said Chicago & Alton Railroad Company, by the said party of the third part, its successors, legal representatives or assigns, or any other person or persons, by, through, or with its privity, order or procurement, in breach of this covenant; provided, that in case the grain elevator or warehouse which has been constructed on the premises above described, owned by the party of the third part, shall cease to be used for the storage of grain, and the said premises shall be permanently converted to other uses, nothing in this agreement contained shall deprive the said party of the third part, its successors or assigns, of any right it or they may have as owner or owners of the said above described premises to demand, sue for, and recover of, and from the said parties of the first and second parts, or from the Chicago & Alton Railroad Company, any damages resulting to the said premises so owned by it, or them, from the causes aforesaid.

Second.    In consideration of the foregoing covenants and agreements being kept and performed by the parties of the third and fourth parts, the parties of the first and second parts severally covenant and agree each for itself, and not for the other, that, when the said railroad shall be completed, as contemplated in the said ordinance, and substantially upon the route therein described, they respectively will, after the same shall be opened for business, and so long as they, their successors or assigns, shall be permitted to maintain and operate the same for the compensation hereinafter specified, deliver, or cause to be delivered to the said National Elevator, and to the said Chicago & St. Louis Elevator, respectively, with all reasonable despatch, all cars loaded with grain, consigned to either of said elevators,

which shall be brought to Chicago over their respective lines of railroad, whether the said grain shall be shipped from stations on their own lines, or be received for transportation to Chicago at junction points from connecting lines; and that they will, with like reasonable despatch, remove or cause to be removed all such cars after the same shall have been unloaded. The parties of the first and second parts severally undertake and bind themselves to arrange for and procure all necessary accommodations and concessions from the Chicago & Alton Railroad Company to carry out the foregoing agreement. All loaded or partly loaded cars taken to either elevator shall be subject to a charge of one dollar per car and no more, for the switching service, to be paid by the owner of the grain or the consignee, and the empty cars shall be removed without further charge.

It is further understood and agreed that the switching charge to be made for the aforesaid service, shall never exceed that made to others for a like service; and if at any time switching charges for such a service shall be abolished on the railroads within the city of Chicago, they shall be no longer exacted from the parties of the third and fourth parts."

The appellants, the National Elevator & Dock Company, and Keith & Company, are the owners, respectively, of the National, and the Chicago & St. Louis Elevators, which are public warehouses of "Class A," used for the storage of grain, and for more than five years prior to the filing of the bill have been operated in connection with each other under the management of the National Elevator & Dock Company.

These elevators are a short distance from each other and are situated on the south side of the south branch of the Chicago river, near Halsted street, in Chicago. The tracks of the Chicago & Alton Company have been for many years past, and are now, laid and operated on the south side of both of these elevators, and connected with each of them by switches.

In 1890 and 1891, double track lines of railway were laid and constructed by appellee, the Chicago, Madison & Northern Railroad Company, and by the Atchison, Topeka & Santa Fe Railroad Company in Chicago, to the south of these elevators, and of the tracks of the Chicago & Alton, by virtue of an ordinance of the city council of Chicago, passed August 1, 1889. Since their construction these tracks have been used by said railroad companies as parts of their lines from the west of said elevators to their respective terminals to the north and east of the same; said Madison & Northern using the terminals of appellee, the Illinois Central Railroad Company, at and near Randolph street in Chicago, as and for its terminals.

The Madison & Northern Railroad has since its construction been controlled and operated, and is now controlled and operated, by the Illinois Central, and is generally designated and called the "Iowa Division of the Illinois Central Railroad Company."

Bearing the same date of the agreement above set forth, October 1, 1891, another agreement was entered into between the Chicago & Alton Railroad Company, of the first part, and the said Chicago, Madison & Northern Railroad Company, and the Atchison, Topeka & Santa Fe Railroad Company in Chicago, parties, respectively, of the second and third parts, whereby it was recited and provided, among other things, as follows:

"Whereas, an agreement in writing is now about to be concluded by and between the Chicago, Madison & Northern Railway Company; the Atchison, Topeka & Santa Fe Railroad Company in Chicago; the National Elevator & Dock Company, and the firm of Keith & Company, wherein and whereby said National Elevator & Dock Company and the said firm of Keith & Company will severally consent to the construction of the said railroad, as proposed in said ordinance; and the said firm of Keith & Company will covenant and agree to release each of the several parties hereto from any and all claims for damages, which may result to their property above described from the construction of the said

railroad and the railroad tracks provided for in said ordinance, or the use thereof, or from the making of the street improvements and other public works required or provided for in the said ordinance; and the said National Elevator & Dock Company will covenant and agree that while and so long as the property owned by it, above described, shall continue to be used for elevator purposes, it will not set up nor make any claim against either of the parties hereto for damages which may result to said property by reason of the construction of the said railroad and the railroad tracks provided for in said ordinance, or the use thereof, or from the making of the street improvements and other public works required or provided for in said ordinance; and in consideration thereof the said Chicago, Madison & Northern Railroad Company and the said Atchison, Topeka & Santa Fe Railroad Company in Chicago, will severally covenant and agree, each for itself and not for the other, " that if the said railroad shall be constructed as contemplated in the said ordinance and substantially upon the route therein described, they respectively will, after the same shall be open for business, for the compensation hereinafter specified, deliver or cause to be delivered to the said National Elevator, and the said Chicago & St. Louis Elevator, respectively, with all reasonable despatch, all cars loaded with grain consigned to either of said elevators which shall be brought to Chicago over their respective lines of railroad, whether the said grain shall be shipped from stations on their own lines or be received for transportation to Chicago at junction points from connecting lines; and that they will with like reasonable despatch, remove or cause to be removed all such cars after the same shall have been unloaded;" and the said Chicago, Madison & Northern Railroad Company, and the said Atchison, Topeka & Santa Fe Railroad Company in Chicago, will further " severally undertake and bind themselves to arrange for and procure all necessary accommodations and concessions from the Chicago & Alton Railroad Company to carry out the foregoing agreement;" and *   *   *

Whereas, neither the said Chicago, Madison & Northern

Railroad Company nor the said Atchison, Topeka & Santa
Fe Railroad Company in Chicago, parties hereto of the sec-
ond and third parts, has any side or spur tracks connecting
its railroad with the premises of the said National Elevator
& Dock Company or the premises of the firm of Keith &
Company, hereinbefore described, and no such connecting
track or tracks can be laid without crossing the main tracks
of the said Chicago & Alton Railroad Company, party
hereto of the first part, and thereby causing serious incon-
venience and damage to the said party of the first part;

Now, therefore, in consideration of the premises and of
the sum of one dollar to it in hand paid, the receipt of which
is hereby acknowledged, the said party of the first part cove-
nants and agrees with the said parties of the second and
third parts and each of them, severally, that it will receive
all cars loaded with grain consigned to the said National
Elevator or to the said Chicago & St. Louis Elevator,
which shall be brought to Chicago by the said parties of the
second and third parts, respectively, over their respective
lines of railroad, and which shall be delivered by them or
either of them to the said party of the first part, upon its
side track to be constructed for that purpose between Mary
street and Halsted street, in the city of Chicago, upon the
premises of the party of the first part, immediately adjoin-
ing the right of way of the party of the second part and on
the north side thereof, and that it will with all reasonable
dispatch cause all such cars to be transferred to and deliv-
ered at either of the said elevators to which the same may
be consigned, and that it will with like reasonable dispatch
remove or cause to be removed from each of said elevators
all such cars, after the same shall have been unloaded and
returned to the party of the first part or the party of the
second part, from which the same were received, upon the
side track where the same were delivered to the party of the
first part, provided that the empty cars so returned shall be
seasonably removed from the said side track, so that there
may be no unnecessary delay in the delivery and return of
cars to be switched to or from the said elevators. All loaded

or partly loaded cars taken to either elevator shall be subject to a charge of one dollar per car, and no more, for the switching service, and the empty cars shall be returned without further charge, bills to be rendered to each of the parties of the second and third part and paid by them monthly. It is further covenanted and agreed that the switching charge to be made for the aforesaid service shall never exceed that made to others for a like service, and that this agreement shall continue in force so long as the two elevators hereinbefore mentioned shall continue to be used as warehouses for the storage of grain."

It will be observed that both agreements, in describing and referring to the delivery of cars of grain to the elevators, use exactly the same language, viz.:

"All cars loaded with grain, consigned to either of said elevators, which shall be brought to Chicago over their respective lines of railroad."

The bill alleges that it has been for several years last past and is now the custom in the city of Chicago, that grain coming to the city shall be placed upon side track, and that forty-eight hours or more shall be allowed for the inspection of the same, and that during such time it shall be subject to delivery at the place to be named by the consignor or the person to whom it shall be sold; that it has been and is the uniform custom to bill grain on the roads leading to Chicago, but not to any particular elevator; that the owner has the right after arrival, and within the said period of forty-eight hours, to sell the same on track, and the purchaser to direct the same to be delivered, if to an elevator, to such elevator as he shall by notice to the railroad company direct; and avers that the charge for such delivery, where the same is to an elevator connected with the railroad upon which the same has been transported, should not be more in the cases where such grain has been sold after arrival and before delivery than where the same has been directed to be delivered by the owner, either at the point of consignment or afterward, and before delivery.

The answer denies the custom referred to in the bill, and

avers that the custom has been and is, to deliver grain to the elevators on the line of the railroad over which the same is brought to Chicago, unless the same has been consigned, at the point of shipment, to some particular elevator; denies that either of said elevators is on the line of the Madison & Northern Company, and avers that the only means by which grain can be delivered to the elevators is over the tracks of the Chicago & Alton; denies that the Madison & Northern has any right whatsoever by contract, or otherwise, to run cars of any kind over the tracks of the Chicago & Alton, except such as were loaded with grain consigned to said elevators.

The answer further sets up that, under the contract with the Elevator Company and Keith & Company, only cars of grain consigned at the time of shipment to either of said elevators are embraced in the contract, and that the Chicago & Alton, under its contract for the movement of grain cars over its tracks is bound only to carry over its tracks grain so consigned; that the word " consigned," as used in both contracts, had a well understood and defined meaning, which had been judicially determined and fixed by the Supreme Court of this State prior to the time said contracts were made, and that the contracts were made and entered into by the parties thereto with reference to the judicial construction of the meaning of the language employed.

The answer admits that said Madison & Northern Company, through the officers of said Illinois Central Company, acting for it and on its behalf, has claimed, and now claims, that it is not bounden either by virtue of said agreement in writing, or under the law, to deliver to either of said elevators at a charge of one dollar per car any grain received by it for transportation, except such as may have been consigned to one of said elevators at the point of shipment; and claims that neither by said agreement nor otherwise has the said Madison & Northern Company ever had the right to deliver, or to force the delivery to either of said elevators, any grain, except such as was originally and at the place of shipment, consigned thereto.

We think the evidence fairly sustains the allegations of the bill concerning the custom prevailing in Chicago, with reference to grain shipped to that place and not consigned at the point of shipment to any particular elevator; in other words that where grain is consigned to a commission house in Chicago, generally, without naming any particular elevator to which it shall be delivered, the custom is that the car containing it shall be switched to a side track and there remain for a period of forty-eight hours for inspection and marketing of the grain; that after such inspection and within forty-eight hours of its arrival, the owner, or the purchaser, if he shall sell it, has the right to direct the same to be delivered, if to an elevator, to such elevator as he shall by notice to the railroad company direct, and that it is the duty of the railroad company to so deliver it, if to an elevator connected with the railroad upon which the same has been transported, at no greater charge per car where such grain has been sold after arrival and before delivery, than where the same has been directed to be delivered by the owner, either at the point of shipment, or afterward, and before delivery.

Under the law of the State it is the duty of a railroad company to deliver to any elevator on its line of road without unjust discrimination as to rates, all grain, whether consigned to that elevator at the point of shipment, or otherwise directed to be delivered to an elevator, by the owner or consignee, while the grain is in the possession of the railroad company.   Secs. 121, 122, Chap. 114, 2 Starr & Curtis' Statutes; Vincent v. C. & A. R. R. Co., 49 Ill. 33; Hoyt v. C., B. & Q. R. R. Co., 93 Ill. 601.

There is nothing in the contract in this case between the Elevator Company and the railroads to indicate an intention on the part of either party to relieve the railroad companies from this general law of the State, but on the other hand, it appears to have been entered into with especial design to so situate the railroads and the elevators as that the general law should be applicable.

The elevators were not connected with the land on which

the railroads were to be constructed, but were separated therefrom by the Chicago & Alton right of way and tracks.

Having, however, or claiming, some such property interest as they apprehended would, or might be, injuriously affected by the construction and operation of the railroads, or by the change in the location of a street necessitated by the construction of the railroads on the proposed route, the elevator company released the said railroad companies, and the Chicago & Alton Company, from all claim for such damages, in consideration that the railroad companies should deliver to the elevators all grain consigned to them which should be brought to Chicago over the lines of said roads, and that the said railroad companies and the said Chicago & Alton Company, should so contract together as to make such delivery of grain practicable.

The railroad companies and the Chicago & Alton Company did so contract by an agreement made at the same time, and thereby the right to the said railroad companies to deliver grain brought by them to Chicago and consigned to the said elevators, over the side track of the Chicago & Alton Company, constructed for that purpose, was secured, and within the principle laid down in Hoyt v. C., B. & Q. R. R. Co., 93 Ill. 601, the elevators must be considered as being on the line of the said Chicago, Madison & Northern Company, for that purpose. If this be true, in contemplation of law, then independently of a construction to be given to other parts of the contract between the elevator companies and the railroads, the duty existed on the part of the railroad to deliver to the elevators all grain so consigned or directed.

The main contention under the contract, however, is as to how much, or what, grain the Chicago, Madison & Northern Company is bound to deliver to the elevators, and that contention arises over the true meaning of the word "consigned" as employed in both the contracts referred to.

Under the law as now settled, the Chicago, Madison & Northern Company would have no right to discriminate between different elevators on its line of road. The object of the elevator companies in entering into the contract was to

secure such a connection with the railroad as would protect them against such discrimination and give them equal facilities with their competitors situated on the line of that road.

Without making some contract, and before the contract was made, they were at a disadvantage so far as the business of the Chicago, Madison & Northern road was concerned, because they were not located upon its line of road. With the making of it that disadvantage was removed. Both parties were fully aware of the situation and contracted with reference to it. Most contracts, to be understood, need the aid of the light of surrounding circumstances. Those circumstances in this case consist in the custom prevailing in Chicago with reference to consigned grain, and in the situation to each other of the contracting parties. Had the elevators been located on the line of the Chicago, Madison & Northern Company before the two contracts were made, there would have been no occasion for the contracts. The object of the contracts was to secure something that did not before exist.

Shall such a construction be given to a word used by the contracting parties as will render inoperative the very thing sought to be attained? That is not the way men of business conduct their affairs.

The construction which supports a contract and makes it effective for the purposes for which it was intended, is the true one, for men are not supposed to contract idly. Field v. Leiter, 118 Ill. 17; Peckham v. Haddock, 36 Ill. 38; Reed v. Ins. Co., 95 U. S. 23.

There is nothing in either of the contracts which requires the word "consigned" to be limited in its application only to grain ordered to the elevators when first shipped. On the contrary every fair inference growing out of the situation in which the parties were placed, and the business being conducted and provided for, that of a carrier on the one hand and that of warehousemen on the other, shows that no such limitation was in the contemplation of either party.

Adding to this the custom prevailing with regard to consigned grain, with reference to which the parties are legally

presumed to have contracted, the conclusion is well nigh forced that when the word "consigned" was used, it was meant to include all grain directed either by the consignor or consignee, or by a purchaser, to be delivered to the elevators in question, either at the time of shipment, or afterward, within the customary period before delivery.

It remains, however, to determine whether what we have said is settled the other way, by the decision in C. & N. W. Ry. Co. v. Stanbro, 87 Ill. 195.

We are not at liberty, even if we were so disposed, to question the soundness of that decision. As applied to the facts and circumstances existing in that case, the decision announced a perfectly reasonable construction of the statute.

As was there said, section 121, chapter 114, 2 Starr & Curtis, (there cited as section 82), is penal in its provisions, and the action was to enforce a penalty for its violation. The grain in that case was consigned, generally, to the station, and the warehouse to which the company refused to deliver it was located at a point some six hundred feet distant from the station, and fifty feet from the side track of the railroad.

The decision must be interpreted with reference to the facts upon which it was based.

Here the contract was to deliver all grain brought over the road and consigned to the elevators in question, and the contract was made with reference to the custom shown to exist. There was no proof or question about a custom, in the Stanbro case. In that case there was a contract of consignment to a particular station on the line of the road, and no proof that by custom such a contract meant delivery to a changed or substituted destination, in case such a change or substitution should be made by the consignor, or consignee, before delivery. Nor was there any proof of provision for an increased charge for switching to any other place.

The element of unreasonable inconvenience dwelt upon by the court in the Stanbro case, is wholly wanting in the case at bar. There is an express provision in the contract

for the payment of one dollar per car for switching charges, and there is nothing in the case to indicate that the switching necessary to reach the elevators in question was, or would have been, any more onerous upon the railroad company in case the grain were ordered to those elevators after being side tracked for inspection upon reaching Chicago, as was done, than if so ordered at the point of shipment.

The fair inference from the record is, that the place of track storage was, or would be, the same in either case.

The element of a special contract provision such as existed in this case, the meaning of which, as we have seen, must be ascertained from the custom prevailing, and from the circumstances under which, and purposes for which it was made, was entirely lacking in the Stanbro case, and what was there decided with reference to the facts there existing, can not be said to control the decision of this case. It should also be borne in mind that in interpreting the meaning of a word in a penal statute, which is what the court in the Stanbro case held section 121 to be, the strict rules apply, whereas, when the word to be interpreted exists in a contract, the court will, so to speak, put itself into the shoes of the parties in order to find out what their use of the word, under all the circumstances, meant.

Although apparently not urged below, the misjoinder of Murry, Nelson & Company, a corporation, as complainants, was raised by the answer, and is presented here. What should have been done by the Circuit Court may be directed to be done now. 1 Daniell's Ch. Pl. & Pr. 303; Story's Eq. Pl. (9th Ed.), Sec. 283, and cases cited.

Its presence in the cause seems to be in no way necessary to the doing of full justice, and there should have been a dismissal ordered as to that corporation, and a decree in favor of the other complainants.

The judgment of the Circuit Court dismissing the bill for want of equity will be reversed, with directions to that court to dismiss Murry, Nelson & Company out of the cause as complainants, and to enter a decree in favor of the other complainants in accordance with the prayer of the bill. Reversed with directions.