CHICAGO, MADISON AND NORTHERN RAILROAD CO. *et al.*

*v.*

NATIONAL ELEVATOR AND DOCK COMPANY *et al.*

*Filed at Ottawa October 29, 1894.*

1. CONTRACTS—*construction, as affected by circumstances.* In arriving at the intention which must control in the construction of a contract, the apparent meaning of language may be enlarged or limited by reference to the circumstances surrounding the parties when they contracted, and the object they had in view.

2. SAME—*the word "consigned" enlarged by extraneous facts.* The words "consigned to said elevators," used in a contract for delivery of grain by a carrier in Chicago; are properly construed with reference to the long practice of billing grain simply *to Chicago*, leaving the designation of the ultimate consignee (elevator) to be made after the arrival of the grain.

3. SAME—*"consigned," in such case, will include directions given after grain arrives.* The agreement of a carrier to deliver to two elevators in Chicago "all cars loaded with grain *consigned* to either of said elevators," includes cars ordered to said elevators after arrival in Chicago, and is not restricted to such cars as are originally so *consigned* at the point of shipment. This case distinguished from *Stanbro case,* 87 Ill. 195.

4. SAME—*that construction is preferred which gives effect.* If there are two possible constructions of a contract, that one will be adopted which will give the contract force and effect, and not that which will render it inoperative.

5. SAME—*intent more important than particular words.* Greater regard should be had to intent, when ascertained, than to the particular words used to express the intent.

6. CARRIERS—*duty to deliver grain, under the constitution.* A railroad track leading to an elevator, which, by contract with another carrier, is to be used to deliver grain to such elevator brought in by such carrier, is a "track which can be used" by the carrier having such contract right, within the meaning of section 5, article 13, of the constitution, and such carrier must meet its constitutional duty of delivering the grain to such elevator when required.

7. PARTIES—*company owning the tracks a proper but not necessary party.* In such case, the company which owns the track leading to the elevator is a proper, but not a necessary, party defendant in a suit in chancery to compel the delivery of cars of grain at such elevator, in accordance with the contract and the constitution.

8. SAME—*when party will be deemed a necessary defendant.* When the objection of the non-joinder of a party is not taken by demurrer, plea or answer, it will receive little favor, and will not avail unless the decree would deprive the party omitted, of his legal rights.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

Mr. BENJAMIN F. AYER, Mr. C. V. GWIN, and Mr. JAMES FENTRESS, for the appellants:

A contract, if enforced specifically, must be enforced as the parties made it. If the terms are uncertain, or not made out by clear and satisfactory proof, the court will not interfere, either by way of injunction or by decree for specific performance. *Long* v. *Long,* 118 Ill. 638; *Woods* v. *Evans,* 113 id. 186; *Wallace* v. *Rappleye,* 103 id. 230; *Bowman* v. *Cunningham,* 78 id. 48; 1 Story's Eq. Jur. secs. 767, 769; *Gosse* v. *Jones,* 73 Ill. 508.

Usage can never be set up in contravention of the contract. The parties may, by their contract, exclude any custom, no matter how ancient or uniform; but no cus-

tom can abrogate the terms of a contract, and no usage can be incorporated into a contract which is inconsistent with the terms of the contract. *Railway Co.* v. *Richards,* 126 Ill. 448; *Gilbert* v. *McGinnis,* 114 id. 28; *Dixon* v. *Dunham,* 14 id. 324; *Hearne* v. *Insurance Co.* 20 Wall. 488; *Barnard* v. *Kellogg,* 10 id. 383; *Insurance Co.* v. *Wright,* 1 id. 456; *Oelricks* v. *Ford,* 23 How. 49; 2 Parsons on Contracts, 542, 546, 547; *Phillips* v. *Briard,* 1 H. & N. 21.

A court of equity will not interfere, either by way of injunction or by decree of specific performance, to compel performance of an agreement, if it is not in the power of the defendant to obey the order of the court. *Sauer* v. *Ferris,* 145 Ill. 115; *Wollensak* v. *Briggs,* 119 id. 453; *Hurlbut* v. *Kautzler,* 112 id. 482; 3 Pomeroy's Eq. Jur. sec. 1405, and notes.

The defendants are neither under a common law nor statutory duty to deliver grain to said elevators, because the defendants have no legal right, by contract, license or otherwise, to use or operate the tracks of the Chicago and Alton railroad, which alone connect with said elevators. *Hoyt* v. *Railroad Co.* 93 Ill. 601.

The defendants were only bound to deliver to said elevators such grain as was *consigned, at the time of shipment,* to said elevators, or either of them. *Railroad Co.* v. *Stanbro,* 87 Ill. 195.

Mr. George W. Smith, for the appellees :

The construction which supports a contract is taken as the true one, for parties are always supposed to have intended something, rather than nothing, by what they have said. Jones on Coml. Contracts, sec. 223, and cases cited; *Peckham* v. *Haddock,* 36 Ill. 38; *Field* v. *Leiter,* 118 id. 17.

The intention of the parties, it is true, must govern, but the language may be enlarged or limited by reference to the circumstances surrounding the parties, and the objects they evidently had in view. *Robinson* v. *Stow,* 39 Ill. 568; Jones on Coml. Contracts, sec. 81, *et seq.*; Browne

on Parol Evidence, secs. 53-56 ; *Field* v. *Leiter*, 118 Ill. 17; *Bradley* v. *Steam Packet Co.* 13 Pet. 89; *Nash* v. *Towne*, 5 Wall. 689 ; *Barreda* v. *Silsbee*, 21 How. 146 ; *United States* v. *Peck*, 102 U. S. 64 ; *Reed* v. *Insurance Co.* 95 id. 23 ; *Merriam* v. *United States*, 107 id. 437.

Parol evidence is competent to annex to a contract a custom or usage of the business and locality known to the parties, or so general and well settled as to be presumed to be known to them, and with reference to which they must be deemed to have contracted.   Browne on Parol Evidence, sec. 58; Jones on Coml. Contracts, sec. 97, *et seq.*; *Doane* v. *Dunham*, 79 Ill. 131; *Corbett* v. *Underwood*, 83 id. 324 ; *Bailey* v. *Bensley*, 87 id. 566; *Robinson* v. *United States*, 13 Wall. 363 ; *Richmond* v. *Steamboat Co.* 87 N. Y. 240.

Usage will govern manner of delivery.   Hutchinson on Carriers, secs. 338, 342, and cases cited ; *Richmond* v. *Steamboat Co.* 87 N. Y. 240.

Mr. JUSTICE BAKER delivered the opinion of the court :

The National Elevator and Dock Company is the owner of the National Elevator, and the firm of Keith & Co. is the owner of the Chicago and St. Louis Elevator.   Both elevators are public warehouses of class "A," used for the storage of grain, and for a number of years past have been operated in connection with each other, under the management of the National Elevator and Dock Company. These elevators are a short distance from each other, and are situated on the south side of the south branch of the Chicago river, near Halsted street, in Chicago.   The tracks of the Chicago and Alton Railroad Company have been for many years past, and are now, laid and operated on the south side of both these elevators, and connected with each of them by switches.

In 1890 and 1891 double track lines of railway were laid and constructed by the Chicago, Madison and Northern Railroad Company and the Atchison, Topeka and

Santa Fe Railroad Company in Chicago, to the south of these elevators, and to the south of the tracks of the Chicago and Alton, by virtue of an ordinance of the city council of Chicago passed August 1, 1889. Since their construction these tracks have been used by said railroad companies as parts of their lines from the west of said elevators to their respective terminals to the north and east of the same, said Madison and Northern using the terminals of the Illinois Central Railroad Company, at and near Randolph street, in Chicago, as and for its terminals. The Madison and Northern railroad has, since its construction, been controlled and operated, and is now controlled and operated, by the Illinois Central, and is generally designated and called the "Iowa Division of the Illinois Central Railroad Company."

The ordinance referred to provided, among other things, that Archer avenue, between Bushnell and Sanger streets, should be widened by appropriating therefor land on the south side of said avenue lying north of the line described in said ordinance; and also that said Madison and Northern company should have the right to construct, maintain and operate a railroad with two or more main tracks, and necessary side or connecting tracks, etc., over and across and upon the route in said ordinance designated, and that the Atchison company should have similar rights, the said route embracing, in part, the portion of Archer avenue so ordained to be widened.

The controversy that appears in this record grows out of an agreement under seal, dated October 1, 1891, executed by the Chicago, Madison and Northern Railroad Company, party of the first part, the Atchison, Topeka and Santa Fe Railroad Company in Chicago, party of the second part, the National Elevator and Dock Company, party of the third part, and the firm of Keith & Co., party of the fourth part. By this contract the two elevator companies severally agreed to waive or release all damages that might result to their respective properties

from the construction of a railroad pursuant to the terms of said ordinance passed by the city council of Chicago, August 1, 1889. In consideration of such release the two railroad companies severally covenanted and agreed, each for itself, and not for the other, as follows : "That when the said railroad shall be completed, as contemplated in the said ordinance, and substantially upon the route therein described, they respectively will, after the same shall be opened for business, and so long as they, their successors or assigns, shall be permitted to maintain and operate the same, for the compensation hereinafter specified, deliver, or cause to be delivered, to the said National Elevator and to the said Chicago and St. Louis Elevator, respectively, with all reasonable dispatch, all cars loaded with grain consigned to either of said elevators which shall be brought to Chicago over their respective lines of railroad, whether the said grain shall be shipped from stations on their own lines, or be received for transportation to Chicago at junction points from connecting lines, and that they will, with like reasonable dispatch, remove, or cause to be removed, all such cars after the same shall have been unloaded. The parties of the first and second parts (the two railroad companies) severally undertake and bind themselves to arrange for and procure all necessary accommodations and concessions from the Chicago and Alton Railroad Company to carry out the foregoing agreement. All loaded or partly loaded cars taken to either elevator shall be subject to a charge of one dollar per car, and no more, for the switching service, to be paid by the owner of the grain or consignee, and the empty car shall be removed without further charge. It is further understood and agreed that the switching charge to be made for the aforesaid service shall never exceed that made to others for a like service, and if, at any time, switching charges for such a service shall be abolished on the railroads within the city of Chicago, they shall no longer be exacted from the parties of the third and fourth parts."

On the same first day of October, 1891, and simultane-
ously with the execution of the foregoing agreement, a
tripartite contract, under seal, was concluded between
the Chicago and Alton Railroad Company, party of the
first part, the Chicago, Madison and Northern Railroad
Company, party of the second part, and the Atchison,
Topeka and Santa Fe Railroad Company in Chicago, party
of the third part.   In this latter contract, after reciting
that an agreement in writing was about to be concluded
by the Chicago, Madison and Northern Railroad Com-
pany and the Atchison, Topeka and Santa Fe Railroad
Company in Chicago with the two elevator companies,
containing the several stipulations and covenants above
mentioned, (which were set out at length,) and that neither
the said Chicago, Madison and Northern Railroad Com-
pany nor the said Atchison, Topeka and Santa Fe Rail-
road Company in Chicago "has any side or spur-track
connecting its railroad with the premises of the said Na-
tional Elevator and Dock Company or the premises of
the firm of Keith & Co., hereinbefore described, and no
such connecting track can be made without crossing the
main tracks of the said Chicago and Alton Railroad Com-
pany, parties hereto of the first part, and thereby caus-
ing serious inconvenience and damage to the said party
of the first part," the Chicago and Alton Railroad Com-
pany covenanted and agreed with the two railroad com-
panies, parties of the second and third parts, and each
of them severally, in manner following: "That it will
receive all cars loaded with grain consigned to the said
National Elevator or to the said Chicago and St. Louis
Elevator which shall be brought to Chicago by the said
parties of the second and third parts, respectively, over
their respective lines of railroad, and which shall be deliv-
ered by them, or either of them, to the said party of the first
part, upon its side-track to be constructed for that pur-
pose between Mary street and Halsted street, in the city
of Chicago, upon the premises of the party of the first

part immediately adjoining the right of way of the party of the second part, and on the north side thereof, and that it will, with all reasonable dispatch, cause all such cars to be transferred to and delivered at either of the said elevators to which the same may be consigned, and that it will, with the like reasonable dispatch, remove, or cause to be removed, from each of said elevators all such cars after the same shall have been unloaded, and returned to the party of the second part or the party of the third part, from which the same were received, upon the side-track where the same were delivered to the party of the first part, provided that the empty cars so returned shall be seasonably removed from the side-track, so that there may be no unnecessary delay in the delivery and return of cars to be switched to or from the said elevators. All loaded or partly loaded cars taken to either elevator shall be subject to a charge of one dollar per car, and no more, for the switching service, and the empty cars shall be returned without further charge, bills to be rendered to each of the parties of the second and third parts, and to be paid by them monthly. It is further covenanted and agreed that the switching charge to be made for the aforesaid service shall never exceed that made to others for a like service, and that this agreement shall continue in force so long as the elevators hereinbefore mentioned shall continue to be used as warehouses ·for the storage of grain."

The bill in equity herein was filed in the Cook circuit court by the National Elevator and Dock Company, the firm of Keith & Co. and by Murry Nelson & Co., a corporation engaged in the grain and commission business, and the Chicago, Madison and Northern Railroad Company and the Illinois Central Railroad Company, the now appellants, were made defendants.

The bill alleges, among other things, that it has been for several years last past, and is now, the custom in the city of Chicago, that grain coming to the city shall be

placed upon side-track, and that forty-eight hours shall be allowed for the inspection and unloading of the same, and that during such time it shall be subject to delivery at the place to be named by the consignor or the person to whom it shall be sold ; that it has been and is the uniform custom to bill grain on the roads leading to Chicago, but not to any particular elevator; that the owner has the right, after arrival, and within the said period of forty-eight hours, to sell the same on track, and the purchaser to direct the same to be delivered, if to an elevator, to such elevator as he shall, by notice to the railroad company, direct, and that the charge for such delivery, where the same is to an elevator connected with the railroad upon which the same has been transported, should not be more in the cases where such grain has been sold after arrival and before delivery, than where the same has been directed to be delivered by the owner, either at the point of consignment or afterward, and before delivery.

The nature of the bill, otherwise, is, for the purposes of this appeal, sufficiently indicated by its prayer. It prays that defendants may be decreed to specifically perform the agreement in writing bearing date the first day of October, 1891, hereinbefore set forth and referred to, and that they may be enjoined and restrained from refusing to transport and deliver to the said National Elevator and the Chicago and St. Louis Elevator, or either of them, grain received for transportation to Chicago by said Madison and Northern company, whether from stations on its own lines or at junction points from connecting lines, that may be ordered to either of the same from track at the city of Chicago, by the consignor at the original point of shipment or by the consignee of the same, or the purchaser from such consignee, provided the delivery of the same shall be ordered within forty-eight hours after the arrival of the same, at a cost of not exceeding one dollar per car for switching service, and from further continuing

to refuse to perform its duty in the premises. And there is a prayer for general relief.

The joint and several answer of the Chicago, Madison and Northern Railroad Company and Illinois Central Railroad Company claims that the Chicago, Madison and Northern company is not bounden, either by virtue of the agreement of October 1, 1891, or under the law, to deliver to either of said elevators, at a charge of one dollar per car, any grain received by it for transportation, except such as may have been consigned to one of said elevators at the point of shipment, and claims that neither by said agreement nor otherwise has the said Madison and Northern company ever had the right to deliver to, or to force the delivery to, either of said elevators of any grain except such as was originally and at the place of shipment consigned thereto; nor have said elevators, or either of them, ever been connected with, or in law or in fact situated upon, the lines of said Madison and Northern company; nor did said Madison and Northern company, by said agreement or otherwise, ever agree to deliver, or cause to be delivered, to said elevators, or either of them, any grain except such as should be, at the point of shipment, consigned thereto; nor is said Madison and Northern company obliged, in any way, to cause to be delivered any other grain not so consigned to said elevators, or either of them. The answer also puts in issue the custom or usage alleged in the bill.

Upon replication being filed, there was a hearing upon the pleadings and proofs, and a final decree was entered dismissing the bill for want of equity. Then, upon appeal to the Appellate Court for the First District, the decree rendered by the circuit court dismissing the bill for want of equity was reversed, with directions to the court below to dismiss Murry Nelson & Co. out of the cause as complainants, and to enter a decree in favor of the other complainants in accordance with the prayer of the bill, and thereupon followed this appeal to this court.

Erastus B. Baldwin is a commission merchant on the Chicago Board of Trade, and has been in business as a commission merchant in grain brought over the railroads from the west and north-west and south-west for twenty-eight years.  He testifies that grain brought to Chicago is simply billed to Chicago; that on arrival there it is inspected by the State, and that it is sold by the car-load from the samples that are drawn by the inspector.  He also testifies:  "After sale we order the car to the destination,—any place where the buyer wishes it.  We order it to the elevator, or we order it on board other cars, or we order it to local industries.  By elevator I mean any elevator we choose to order it to.  If there are public elevators having a license, we don't usually send it off the line from which the car came, but if they are private elevators we consign it to those anywhere we are a mind to in the city.  By public elevators I mean licensed elevators of class 'A.'  We do not order it off the line usually to elevators of that class, because it usually takes more time to do it, and it makes no difference to us, as to price, usually, what elevator it does go into, so we let it go into the elevators on the line of the road that the grain comes in on.  I have not, for quite a long time, known instances of grain being consigned at the point of shipment to a particular warehouse.  Eight or ten years ago it used to be done.  There wasn't as much track selling, and there was more of the regular grades of grain came at that time, especially wheat.  Within the last eight or ten years I have not been familiar with any consignments by shippers at the point of shipment to particular warehouses.  We have not, in our business experience, had any such, and I could not swear that any one else has.  It might have been done.  Our house gets two or three thousand cars a year."

Murry Nelson, one of the parties interested in the suit, testifies that he has been engaged in the grain and commission business at Chicago for thirty-six years, and

is familiar with the customs of the business involving the receipt of grain brought by railroads; that grain brought to Chicago is usually consigned to Chicago, simply,—to any person or firm; that he has in his experience known of instances in which grain has been consigned to particular elevators, but that it is some years since that custom prevailed, and that for the last ten or fifteen years it has been obsolete; that twenty-five years ago it was the almost universal custom, perhaps, to consign to elevators, or if not, the understanding was, without any direction, that regular grades of grain should go to certain elevators.  In his cross-examination Nelson says that it is the universal custom for shippers, and has been for ten or fifteen years, to ship grain to Chicago without consigning it at the point of shipment to any particular elevator; that by the term "universal custom" he means that it is the universal custom,—the entire custom; that he would not say that in ten or fifteen years there had been no exception, but that the exceptions were very rare, and that in a business say of twenty-five or thirty cars a day to his own houses, he does not recollect a single case in the last five years; that seventeen or eighteen different railroads come into Chicago, and his houses receive consignments over all these various roads for sale on the market.

·John T. McBride, superintendent of terminals of the Illinois Central Railroad Company, and prior to that its local freight agent, testifies that the Central company and the Chicago, Madison and Northern company have no way of delivering grain received on their tracks, to either the National Elevator or the Chicago and St. Louis Elevator, except to deliver such grain to the Chicago and Alton company on the tracks known as "interchange tracks," and get the Chicago and Alton to deliver to the elevators, and that he does not know of any cases of shippers shipping grain to Chicago, and naming, at point of shipment, the elevator.

James S. Templeton, a commission merchant, testifies that grain is sometimes consigned in case of eastern roads; that he has known of its being consigned to eastern roads; has known of its being consigned or directed to elevators from point of shipment, and that grain is largely billed to elevators off the line of the tracks over which it arrives, and to eastern roads. And the witness adds: "I don't think we ever billed a car of grain to Murry Nelson's elevator from the country. We may have done so, but I don't remember. Now I think of it, we did. I think we did sell a few cars of grain to Murry Nelson & Co., to be billed to his elevator. I am not positive about it. I am speaking of billing from the point of shipment. It is possible we did bill one. I am not positive. We frequently have cases of billing at the point of shipment to elevators off the road. I sold last spring as high as five or six hundred cars of grain off the St. Paul road, billed in care of the Wabash road; that was billed after it was sold,—billed from the country direct to the elevator; and I have also billed to Mr. Nelson's elevator, but not off the Illinois Central road, as I recollect. At the point of shipment it was billed to these elevators, but after the sale."

In the interpretation of contracts the intention of the parties must govern. But this intention is not to be sought merely in the apparent meaning of the language used, but this language may be enlarged or limited by reference to the circumstances surrounding the parties, and the objects they evidently had in view. (*Robinson* v. *Stow, Admx. et al.* 39 Ill. 568.) The controversy in this case turns largely upon the meaning to be given to the word "consigned," as that word is used in the contract of October 1, 1891. The parties agreed that the Chicago, Madison and Northern Railroad Company would deliver, or cause to be delivered, to the National Elevator and to the Chicago and St. Louis Elevator, respectively, with all reasonable dispatch, all cars loaded with grain, consigned to either of said elevators,

which shall be brought to Chicago over its lines of rail-road. Appellants claim that thereby the agreement was to deliver only such grain as at the point of shipment should be consigned to one or the other of these elevators. Appellees claim that thereby the agreement was to deliver, or cause to be delivered, all cars loaded with grain and brought to Chicago over the Madison and Northern lines of railroad, whether such grain was consigned to one or the other of these elevators at the point of shipment, or so consigned at any time while in the possession of the railroad company. The definitions given by lexicographers to the verb "consign" are not inconsistent with either of these constructions. Baldwin, who has had twenty-eight years' experience in the grain business in Chicago, in speaking of car-loads of grain on the track after sale, says, in substance : If there are licensed elevators of class "A," we don't usually send the grain off the line from which the cars came, but otherwise "we *consign* it to those anywhere we are a mind to in the city." He manifestly understands and uses the word "consign" in the enlarged sense contended for by appellees.

It is urged by appellants that *Chicago and Northwestern Railway Co.* v. *Stanbro*, 87 Ill. 195, is decisive of this case,—that the court there placed a construction upon the word "consigned" used in a statute, and held that to bring the case within such statute the grain must be consigned to the warehouse or place in question at the time of ship-ment. The claim so made has much force, but after full consideration we are inclined to the opinion that the decision there made is not applicable in the present liti-gation. The action there was based upon a section of the statute which is highly penal in its provisions, (Laws of 1871-72, p. 636 ; Rev. Stat. 1874, p. 815, sec. 3 ;) and the decision was partly placed upon the ground that the stat-ute was penal, and could not be extended by construction. But in the interpretation of the contract now before us a different rule obtains. The language used may be enlarged

or limited by the attendant circumstances and the objects had in view, and more regard is due to the real intention of the parties than to some particular word that may have been used in the expression of that intention. And section 4 of the same act of the legislature wherein is found the section upon which the action in *Stanbro's case* was based, reads as follows: "All consignments of grain to any elevator or public warehouse shall be held to be temporary, and subject to change by the consignee or consignor at any time previous to the actual unloading of such property from the cars in which it is transported. Notice of any *change in consignment* may be served by the consignee on any agent of the railroad corporation having the property in possession, who may be in charge of the business of such corporation at the point where such property is to be delivered, and if, after such notice, and while the same remains uncanceled, such property is delivered in any way different from such altered or changed *consignment*, such railroad corporation shall, at the election of the consignee or person entitled to control such property, be deemed to have illegally appropriated such property to its own use, and shall be liable to pay the owner or consignee of such property double the value of the property so appropriated, and no extra charge shall be permitted by the corporation having the custody of such property in consequence of such change of *consignment*." And so, if in section 3 of the act the word "consigned" is used in the sense of indicating a consignment made at the time and point of shipment, and such a consignment only, yet in section 4 the word "consignment," a cognate word with "consigned," seems to have an enlarged sense attached to it,—that of denoting a direction or consignment to a particular elevator or public warehouse at any time prior to the actual unloading of the grain from the cars in which it was transported. The construction of this contract of 1891 is a question of intention, and it seems to us that the conclusions to be drawn

from the phraseology used in the act of 1871, and the decision of this court upon one of its sections, are wholly inconclusive of the matter in issue.

As we understand the evidence in this record, it clearly shows that at the time the contract was made, and for ten or fifteen years prior thereto, all shipments by rail of grain in bulk to Chicago, for sale, were, as matter of fact, made, from the point of shipment, to some named person, firm or corporation, as consignee, and billed to Chicago, simply, and not to any particular or designated elevator. The circumstance that occasionally, but very seldom, grain was purchased before shipment, and for some particular purpose, and consigned at the place of shipment to some designated elevator, does not weaken the probative force of the fact above stated. Nor does the other fact, that sometimes grain, even in large quantities, which had been already sold at western points outside of Chicago for shipment to places east of Chicago, was consigned to some eastern railroad, or some elevator connected therewith. There can be no pretext that, from the standpoint of Chicago, the Chicago and Alton railroad is an eastern road.

In our opinion, the real intent and meaning of the contract of October 1, 1891, when read in the light of the existing and surrounding circumstances, were to give to the National Elevator and the Chicago and St. Louis Elevator facilities for doing business on the lines of the Chicago, Madison and Northern Railroad Company, equally as great as those afforded by law to the competing elevators situated on the line of said railroad in Chicago. The construction of the contract contended for by appellants virtually destroys it, at least so far as the accomplishment of any object useful or beneficial to appellees is concerned. In *Peckham* v. *Haddock*, 36 Ill. 38, this court held that if a contract admits of more than one construction, one of which will render it inefficacious or nullify it, that construction should be adopted which will carry it into effect.

And in *Field* v. *Leiter*, 118 Ill. 17, we said that greater regard is to be had to the clear intent of a contract, when ascertained, than to any particular words which may have been used in the expression of that intent, and that such construction should be adopted, if it consistently may be, as will render the contract capable of execution, rather than to render it inoperative. It seems to us that in the case now before us one construction will give to this formal, sealed agreement of the parties vitality and force, while the other construction would render it wholly frivolous and ineffectual, and thereby frustrate the object which the contracting parties intended to accomplish by it. The maxim, *Ut res magis valeat quam pereat*, applies.

The constitution of the State, in section 5 of article 13, provides as follows : "All railroad companies receiving and transporting grain in bulk, or otherwise, shall deliver the same to any consignee thereof, or any elevator or public warehouse to which it may be consigned, provided such consignee, or the elevator or public warehouse, can be reached by any track owned, leased or used, or which can be used, by such railroad companies." This provision was re-enacted in section 3 of the act of April 25, 1871. (Rev. Stat. 1874, p. 814). In *Hoyt* v. *Chicago, Burlington and Quincy Railroad Co.* 93 Ill. 601, we said : "Where a railroad company has given no license or permission to another company to use their tracks, then such tracks never become a part of the line of road of the other company." And also said : "Under the evidence in this record there is no pretence for saying it [C., B. & Q. Co.] has a license from the Alton company for so doing, and the testimony of the president of that company rebuts any such presumption." And herein the case at bar is easily distinguished from the *Hoyt case*. The record in the present case not only shows that there is a physical connection between the tracks of the Madison and Northern company and those of the Alton company on the tracks known as "interchange tracks," between Mary street and

Halsted street, in the city of Chicago, but it also shows the tripartite agreement of October 1, 1891, wherein the latter company covenanted and agreed with the Madison and Northern company and the Santa Fe company, severally, that it would receive all cars loaded with grain consigned to the National Elevator or to the Chicago and St. Louis Elevator, which shall be brought to Chicago by said two last named parties, respectively, over their respective lines of railroad, and which shall be delivered by them, or either of them, to the Alton company upon its side-track to be constructed for that purpose between Mary street and Halsted street, and that it will cause all such cars to be transferred to and delivered at either of said elevators to which the same may be consigned. This contract, for all the substantial purposes of the contract between the Madison and the Santa Fe companies and the two elevator companies, makes the Alton tracks to the elevators "tracks which can be used by such railroad companies," and virtually parts of their respective lines of road. Under its contract and the law of this State it is the duty of the Chicago, Madison and Northern Railroad Company to deliver to these two elevators, or cause to be so delivered, all grain brought over its lines to Chicago, whether consigned to either of said elevators at the point of shipment, or otherwise directed to be delivered to either of them by the owner or consignee while the grain is in the possession of said railroad company.

It is claimed that the Chicago and Alton Railroad Company is a necessary party to this suit; that, it not being a party, the court cannot make a decree which will be binding upon that corporation, and that a court of equity will not interfere, either by way of injunction or by decree of specific performance, to compel the performance of the agreement, since it is not in the power of the defendants to obey the order of the court. We are inclined to the opinion that the Alton company, although probably a proper, is not a necessary, party to the suit.

It is not a party to the contract, to enforce which the suit is prosecuted. The Madison and Northern company and the Santa Fe company contracted with appellees "to deliver, and to arrange for and procure all necessary accommodations and concessions from the Chicago and Alton Railroad Company" to carry out the agreement that is sought to be enforced. In the absence of allegations and proof to the contrary, it is to be presumed that they have complied with their agreement in that regard. Indeed, from the tripartite agreement which is in evidence, from the fact that the tracks known as the "interchange tracks" were constructed by the Alton company for the express purpose of enabling it to perform its part of that contract, from the fact that the Santa Fe company has delivered, or caused to be delivered, by the Alton company, uniformly and from day to day, any and all grain ordered from their tracks to either of the two elevators, and from other facts in the record, it would seem that there is no reason for anticipating any difficulty from the Alton company. And the Appellate Court did not direct a decree against the Alton company. Its rights, if any, are in no way jeopardized. When the objection of the non-joinder of a party is not taken by demurrer, or by plea, or by answer, such objection receives little favor from the courts, and in such a case, to be of avail, it must appear that the decree will have the effect of depriving the party omitted, of his legal rights. *Manufacturing Co.* v. *Wire Fence Co.* 109 Ill. 71.

We understand it to be in accord with correct chancery practice that the corporation of Murry Nelson & Co., improperly joined as a party complainant, was directed by the Appellate Court to be dismissed out of court prior to the entry of final decree in favor of the other complainants.

The judgment of the Appellate Court is in all things affirmed.

*Judgment affirmed.*